UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 08-11565-RGS

THOMAS J. CONNERS

v.

BILLERICA POLICE DEPARTMENT,
TOWN OF BILLERICA, and
DANIEL ROSA

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

January 19, 2010

STEARNS, D.J.

On September 12, 2008, Thomas J. Conners, a Billerica police patrolman, brought this Uniformed Services Employment and Reemployment Rights Act (USERRA) action[1] against the Town of Billerica, the Billerica Police Department (Department), and Daniel Rosa, the Billerica Chief of Police. On August 31, 2009, defendants moved for summary judgment. The court heard oral argument on the motion on November 30, 2009.

BACKGROUND

Conners joined the United States Army Reserves (Reserves) in November of 1993. In June of 2002, Conners was hired by the Department as a patrolman. In January of 2005, Conners received orders to report for military duty from January 26 through January 31, 2005. Conners gave a copy of his orders to Lt. Ronald Balboni, the Department official responsible for monitoring employee time and attendance. Lt. Balboni informed Conners

---

[1] 38 U.S.C. § 4301, *et seq.*

that he had exhausted the seventeen days of military leave granted by the Town to employees with military obligations. Balboni told Conners that he would be required either to use his vacation time or to "swap" shift assignments with other patrolmen. According to Lt. Balboni, Chief Rosa had been advised by counsel that he was not required to honor Conners' military orders. Conners told him that any refusal by the Chief to do so would violate federal law.

On January 25, 2005, Conners asked for assistance from his father, Thomas Conners, Sr., then the Deputy Chief of Police. Deputy Chief Conners repeated what Balboni had said – that Chief Rosa had been advised by counsel that, as the Chief, he had the right to make the determination whether Conners' military service was in the interest of national security. Conners was instructed to call Lt. Col. Pat Sperlongano, his Army Reserve commander, and explain that his enforced absence would unduly burden the Department's overtime budget.

Conners asked instead to meet with Chief Rosa. Conners brought copies of USERRA and related Massachusetts statutes to the meeting. He told Chief Rosa that any denial of compensated military leave violated federal and state law. Chief Rosa replied that the Counsel for the Massachusetts Chiefs of Police Association had advised him that Conners was entitled to only seventeen days of annual military leave. After the meeting, Lt. Col. Jerry Benson, a Judge Advocate, called Chief Rosa at Conners' request. Lt. Col. Benson told Rosa that his order that Conners forfeit vacation time was illegal. He also told the Chief that he had advised Conners that he had no choice but to report for duty as ordered. Chief Rosa did not relent.

During the ensuing weeks, Conners became physically ill over the impasse. He nonetheless reported for duty as ordered on January 26, 2005. When Conners returned to the Department on February 1, 2005, he learned that he had been classified as on "unpaid military leave."

In February of 2007, Conners was ordered to report to Basic Officer Leadership School. Conners provided Lt. Balboni with a copy of his orders. Shortly before reporting for duty, Conners spoke with his father, who told him that his military service was hurting the Department. Deputy Chief Conners told his son that he had to choose between serving as a police officer and serving as a solider and that "the Department" believed that his military leave was excessive. Conners reported for duty as ordered. On October 15, 2007, he returned to the Department.

Conners was next ordered to attend a military drill on November 17, 2007. When he presented his orders to the Department, Chief Rosa instructed him to take a vacation day. Conners did so.[2] On November 29, 2007, Conners received an email from Lt. Balboni stating that the excess days taken for military service had been deducted from his annual personal, sick, and vacation time. Conners told Lt. Balboni that the Department was again violating USERRA. Balboni told Conners to speak to Chief Rosa. Conners told Rosa that he was being discriminated against because no other Billerica police officer who had taken military leave had lost personal, sick, or vacation time as a result.[3] Chief Rosa

---

[2] Whether Conners voluntarily agreed to take the vacation day is a matter of dispute (as will be explained).

[3] According to Conners, Officer Michael Henckler, a member of the United States Coast Guard Reserves, was activated for service but not penalized by the Department.

3

stated that Conners' military service was a voluntary matter and therefore not covered by USERRA. Conners replied that USERRA did not distinguish between involuntary and voluntary service. Chief Rosa did not budge.

Conners then spoke with Capt. Daniel Doyle and John Harring, the police union president. Conners sent a follow-up email to Doyle, Harring, Chief Rosa, and Balboni, again explaining his understanding of the Department's obligations under USERRA. Conners stated that he was being retaliated against for taking military leave and requested a meeting with Department lawyers. He received no response.

Conners' military Commander, Lt. Sam Gross, contacted Chief Rosa in an attempt to resolve the dispute. Chief Rosa rejected Lt. Gross's argument that the Department was violating USERRA. Conners then contacted the Employer Support for Guard and Reserve (ESGR) and asked for assistance. An ESGR representative, Joachim-Ingo Borowski, arranged a conference call with Chief Rosa and Lt. Balboni. As a result, Chief Rosa reinstated Conners' lost personal time.[4] Borowski believed that the matter had been resolved.

In February of 2008, Conners contacted the U.S. Department of Labor (DOL). On February 28, 2008, Reginald Dupuis, a DOL representative, visited the Department to hold a "technical assistance" meeting.[5] Dupuis informed Chief Rosa and Lt. Balboni that the

---

[4] Eight hours of personal time and forty-eight hours of vacation time were restored to Conners.

[5] According to Conners, Chief Rosa admitted at the meeting that "TJ [Conners] was probably right" at times. Nonetheless, Lt. Balboni told Conners, "You will have to comply with what I want if I make it a policy or put it in the contract." Dupuis explained to Lt. Balboni that he could not implement a policy or contract that would contravene federal law.

Department's actions had violated USERRA. Dupuis additionally found that both of Conners' grievances (the 2005 requirement to use vacation time or swap shifts, and the 2007 denial of leave benefits) had been satisfactorily addressed.[6] DOL closed Conners' USERRA complaint with a "no merit" notation. On May 7, 2008, Conners sent Balboni an email stating that he had learned that other Town employees on active duty had been awarded the differential between their military pay and their base pay. The Town ultimately paid Conners the difference.

On May 7, 2008, Conners was assigned to a bicycle escort of middle school students taking part in a "Minuteman Walk." A citizen complained after observing that Conners and another officer were wearing Department-issued baseball caps instead of bicycle helmets. The citizen felt that the caps set a bad example for the children. Sgt. Jerry Roche spoke to Conners and his partner and told them to wear helmets in the future. Conners believed that the issue was resolved. However, a few days later, Sgt. Roche informed Conners that "they" were forcing him to write a letter of reprimand.

On June 24, 2008, Conners received a letter written by Sgt. Roche dated June 1, 2008.[7] Capt. Doyle later told Conners that the letter had been placed in a "working file."[8]

---

Dupuis additionally told Lt. Balboni that he could not discriminate against Reservists.

[6]After the meeting, Harring asked Lt. Balboni what the Department would do if Conners "topped" the upcoming promotional exam. According to Conners, Balboni informed Harring that "We will never promote TJ, and we will not make any Sergeants before we promote him." According to defendants, Balboni said, "Conners won't, and if he does, we just won't make a Sergeant." It is undisputed that Harring thought that Balboni's comment was an attempt at humor. Balboni testified that he was only joking.

[7]While Conners characterizes the letter as a reprimand, defendants state that it was merely a "letter of oral reprimand," a term of art used by the Department to describe the

5

Conners asked why he had not been shown the letter before it was placed in his file. A few days later, Doyle gave Conners a copy of the letter.[9] Conners contends that the letter was issued in retaliation for his taking military leave. He states that Chief Rosa conceded that other officers had worn patrol caps while riding bicycles and had not received reprimands.[10]

At some point in late 2008, Chief Rosa initiated an internal investigation after receiving a citizen's complaint that Conners had used excessive force while making an arrest. According to Conners, two lieutenants and one captain expressed their opinion that the allegations were not credible. Although Conners received a copy of a letter sent by Chief Rosa to the complainant informing him that the matter would be closed without further action, Conners states that he has never been provided with an "official" statement to that effect. Conners claims that the investigation was undertaken in retaliation for his taking military leave.

---

"memorialization" of an oral reprimand. According to defendants, a letter of oral reprimand has no effect on an officer's career. Conners maintains that the placing of a letter of reprimand in a file that he has not been allowed to see violates his collective bargaining agreement, the Department's own rules and regulations, and Mass. Gen. Laws. ch. 149, § 52C.

[8]According to defendants, a "working file" contains "citizen complaints, investigations that may have happened within the police department, investigative materials, and some personnel records. A working file is different than a personnel file."

[9]While Conners has been given a copy of his personnel file, he complains that he has not been allowed to examine the actual file.

[10]Conners filed a grievance for retaliation, hostile work environment, an unfair labor practice, and discrimination with regard to the bike helmet reprimand. According to defendants, the grievance is still pending. According to Conners, the Town Manager has denied his grievance.

Conners reports that as a result of the defendants' discriminatory acts, he has been unable to sleep properly, has lost his appetite, and suffers nausea and vomiting spasms. He is also apprehensive about reporting to work some mornings for fear that he will be singled out for discipline.

Conners seeks compensation for the day of vacation time lost because of his attendance at the military drill on November 17, 2007. In addition to damages for emotional distress, he seeks reimbursement for the hours that he spent collecting documents in support of his complaints to JAG, ESGR, and DOL, and for his attorney's fees.[11]

## DISCUSSION

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-250 (1986).

1. USERRA

    a. Denial of a Benefit

---

[11]Conners also seeks pay for being "required" to travel to another state to replace his bulletproof vest. Conners does not mention the allegation in his opposition, and the court deems any related claim as waived.

USERRA prohibits discrimination in employment on the basis of military service. It provides, in pertinent part, that

> [a] person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

38 U.S.C. § 4311(a).[12] USERRA additionally sets limits on how an employer may record an employee's time while he or she is on duty in a uniformed service.[13]

> Any person whose employment with an employer is interrupted by a period of service in the uniformed services shall be permitted, upon request of that person, to use during such period of service any vacation, annual, or similar leave with pay accrued by the person before the commencement of such service. No employer may require any such person to use vacation, annual, or similar leave during such period of service.

38 U.S.C. § 4316(d).[14]

Conners concedes that he has by now been paid almost all of what he believes he is owed. He was, for example, listed on "unpaid military leave" in January of 2005; the

---

[12]According to the statute, "[t]he term 'benefit', 'benefit of employment', or 'rights and benefits' means any advantage, profit, privilege, gain, status, account, or interest (other than wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes rights and benefits under a pension plan, a health plan, an employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or location of employment." 38 U.S.C. § 4303(2).

[13]"Uniformed service" includes the Army, Navy, Marine Corps, Coast Guard, Air Force, as well as the Reserves of each branch. See 38 U.S.C. § 4303(16).

[14]USERRA protects persons on "duty . . . in a uniformed service under competent authority," regardless of whether service is voluntary or involuntary. 38 U.S.C. § 4303(13).

8

deducted personal, sick, and vacation time was restored in 2007. He was also (eventually) compensated for any loss of base pay resulting from his active duty assignments in 2007. One day remains in dispute – Conners' drill day on November 17, 2007 – when he was ordered by Chief Rosa to take a vacation day. Although defendants claim that Conners agreed to take a vacation day, he maintains that he was given no choice in the matter by Chief Rosa.[15]

Defendants further contend that Conners did not in fact attend the drill and went instead to his brother's wedding. Conners maintains that his military superiors permitted him to attend the wedding briefly and then return to duty. Conners argues that he should not have been required to take the vacation day, but should have been credited with military leave. Conners stated during his deposition that "[Chief Rosa] was concerned that I wasn't away with the military, that I had just utilized that time and went to my brother's wedding. I explained that that was not what happened . . . . I told him that if [my commanders allowed me to attend], then it's acceptable." Conners Dep., at 49-50. Conners further testified that,

> Chief Rosa was adamant that he felt if I didn't – if he didn't believe I worked enough hours in the military, then I should be required to use personal time. We obviously discussed it. At the end of the conversation, I – I was extremely frustrated and I said, if this – if this ends everything, then fine, I'll take – give me the vacation day.

Id. at 170.

---

[15]Conners states that when he tried to explain to Chief Rosa that forcing him to take a vacation day was discriminatory, the Chief stated, "You give us mud, we'll sling mud."

According to Chief Rosa, however, the conversation had a distinctly different tenor. Chief Rosa recollected the following:

> I believe that he said that he agreed – he understood that, you know, how it looked, and that he agreed to take a vacation day. And I told him that, "Geez, you can save your military day and use it another day when you need it, but it was really an appearance of impropriety." And, you know, I appreciated the fact that he would take a vacation day rather than the military day for the day of his brother's wedding.

Rosa Dep., at 27.

Although a person can waive his rights under USERRA, a waiver must "be clear, convincing, specific, unequivocal, and not under duress." Breletic v. CACI, Inc.– Fed., 413 F. Supp. 2d 1329, 1337 (N.D. Ga. 2006). Here, there is a credibility dispute that cannot be resolved on summary judgment. Conners contends that his "agreement" to take a vacation day was extracted under duress, while defendants argue that the decision was a voluntary one. In reviewing a grant of summary judgment, the court must "constru[e] the record in the light most favorable to the nonmovant and resolv[e] all reasonable inferences in the party's favor." Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009). "[T]o survive summary judgment a plaintiff is not required to rely only on *uncontradicted* evidence." Calero-Cerezo, 355 F.3d at 19 (emphasis in the original). Where, as here, the record contains inconsistencies "that favor in some lights the defendants and in others the plaintiff, . . . the factfinder must be allowed to determine which version of the facts is most compelling." Id. See also Anderson, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). In Massachusetts, whether duress exists in a given

situation is "entirely a question of fact." Pahlavi v. Palandjian, 809 F.2d 938, 944 (1st Cir. 1987), quoting Freeman v. Teeling, 290 Mass. 93, 96 (1935). Therefore, the motion for summary judgment will be DENIED as to the dispute regarding Conners' military drill day on November 17, 2007.

      b. Discrimination/ Retaliation

The anti-discrimination and anti-retaliation provision of USERRA provides that

> [a]n employer shall be considered to have engaged in [prohibited] actions . . . if the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service.

38 U.S.C. § 4311(c). As the First Circuit has noted,

> [t]his two-pronged burden-shifting analysis is markedly different from the three-pronged burden-shifting analysis in Title VII actions. Under the McDonnell-Douglas framework, the burden of persuasion in Title VII actions always remains with the employee. . . . In contrast, under USERRA, the employee does not have the burden of demonstrating that the employer's stated reason is a pretext. Instead, the employer must show, by a preponderance of the evidence, that the stated reason was *not* a pretext.

Velazquez-Garcia v. Horizon Lines of P.R., Inc., 473 F.3d 11, 17 (1st Cir. 2007) (emphasis in the original).

    Among the varieties of evidence that may be offered by a plaintiff to meet his initial burden of showing a discriminatory motivation are "proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's

11

military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses." Sheehan v. Dep't of Navy, 240 F.3d 1009, 1014 (Fed. Cir. 2001). In analyzing a claim under USERRA, the First Circuit has instructed trial courts to utilize the same standards applied when analyzing claims under Title VII. See Velazquez-Garcia, 473 F.3d at 18 n.7.

In order to state a claim for discrimination or retaliation under USERRA, Conners must show, among other things, that he was subjected to an "adverse employment action." Sheehan, 240 F.3d at 1013. Although Conners points to the letter of oral reprimand for failing to wear a bike helmet as a job-related sanction, an oral reprimand is not, as a matter of law, an adverse action under the employment laws. See Wyse v. Summers, 100 F. Supp. 2d 69, 75 (D. Mass. 2000) (counseling and warnings regarding tardiness are not adverse employment actions); Durant v. Nynez, 101 F. Supp. 2d 227, 233 (S.D.N.Y. 2000) (same). See also Sweeney v. West, 149 F.3d 550, 556 (7th Cir. 1998) (reprimands are not included in the definition of adverse employment action "absent some tangible job consequence.").

Nor has Conners offered any facts that support an inference that Chief Rosa ordered an internal investigation of the citizen's excessive force complaint in retaliation for Conners taking military leave, or that the investigation had any adverse employment consequence for Conners. The only rationale that Conners offers in support of his retaliation theory is the assertion that three of his superior officers told Chief Rosa that the citizen's allegations were not credible. This does not make out a prima facie case under USERRA. As a matter of public policy, the court would be loath to endorse the suggestion

that there are circumstances in which a citizen's complaint of excessive use of force by an officer should *not* be investigated.  Nor given the potential liability involved is there any good reason for a police department not to conduct an investigation before dismissing a complaint, even though the complaint may not on its face appear credible.  The motion for summary judgment will consequently be ALLOWED as to the retaliation claim.

        c. Hostile Environment

Conners argues that the numerous USERRA violations, taken together, created an abusive and hostile work environment.[16]  The First Circuit has not addressed the issue of whether workplace harassment on account of military service is actionable under USERRA.  However, the numerous courts that have had the opportunity to do so have uniformly determined that a cause of action lies under a theory of hostile environment analogous to the one authorized by Title VII.  See, e.g., Miller v. City of Indianapolis, 281 F.3d 648, 653 (7th Cir. 2002) (assuming *arguendo* that a cause of action for harassment exists, but finding plaintiff's claims insufficiently severe or pervasive); Figueroa Reyes v. Hosp. San Pablo del Este, 389 F. Supp. 2d 205, 213 (D.P.R. 2005) (same); Dees v. Hyundai Motor Mfg. Ala., LLC, 605 F. Supp. 2d 1220, 1227 (M.D. Ala. 2009) (noting that harassment is cognizable under other anti-discrimination statutes and that USERRA is to be construed liberally for the benefit of service members); Peterson v. Dep't of Interior, 71

---

[16]"Hostile environment harassment is readily distinguishable from 'job status' discrimination, another type of employment discrimination that occurs when action is taken that adversely affects an employee's job status, remuneration or benefits and it is based upon the employee's membership in a protected class.  Thus, when both harassment and 'job status' discrimination claims are made, they are analyzed separately." Lattimore v. Polaroid Corp., 99 F.3d 456, 463 (1st Cir. 1996) (internal citation omitted).

M.S.P.R. 227, 236 (1996) (hostile environment claims fall under an "expansive interpretation" of the USERRA term "benefit"); <u>Vickers v. City of Memphis</u>, 368 F. Supp. 2d 842, 845 (W.D. Tenn. 2005) (same).

To succeed on a hostile work environment claim, Conners must offer "evidence that [defendants'] conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993); <u>Miller</u>, 281 F.3d at 653. "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all of the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Harris</u>, 510 U.S. at 23. While usually a jury issue, a claim of hostile environment is subject "to some policing at the outer bounds." <u>Marrero v. Goya of P.R., Inc.</u>, 304 F.3d 7, 19 (1st Cir. 2002). This case falls into the policing category.

While subjective factors are relevant to a hostile environment claim, <u>see</u> <u>Harris</u>, 510 U.S. at 21, the determination is ultimately an objective one – "whether a reasonable person would perceive the situation to be hostile." <u>Miller</u>, 281 F.3d at 653. The court makes note that Conners is a veteran police officer and a long-time member of the military reserves. No reasonable person in Conners' situation, with his experience, could find Chief Rosa's conduct so sufficiently "severe or pervasive" as to make his working conditions intolerable or even difficult. Putting aside the personality conflict between Conners and Chief Rosa, the only enduring work-related grievance involves their ongoing disagreement about the

requirements of USERRA. Given that Conners has prevailed in almost each instance in which the dispute has arisen, no reasonable jury could find Conners' work environment "threatening or humiliating" or beyond the capacity of a reasonable police officer in Conners' circumstances to endure.

    2. Intentional Infliction of Emotional Distress

In order to prove a claim of intentional infliction of emotional distress, a plaintiff must show:

> (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure it.

Agis v. Howard Johnson Co., 371 Mass. 140, 144-145 (1976) (internal quotation marks and citations omitted). "The standard for making a claim of intentional infliction of emotional distress is very high." Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996). While the intentional tort does not require proof of physical harm, it does require acts that are "extreme and outrageous" undertaken in the attempt "to shock and harm a person's peace of mind," or are part of an incremental pattern of harassment intended to accomplish the same end. Ratner v. Noble, 35 Mass. App. Ct. 137, 139-140 (1993). See also Foley v. Polaroid Corp., 400 Mass. 82, 99 (1987) ("atrocious" conduct); Conway v. Smerling, 37 Mass. App. Ct. 1, 8 (1994) ("profoundly shocking" conduct). Whether a defendant's conduct was "beyond all bounds of decency and . . . utterly intolerable in a civilized

community" is an issue of law for the trial judge.  Sena v. Commonwealth, 417 Mass. 250, 264 (1994).  See also Caputo v. Boston Edison Co., 924 F.2d 11, 14 (1st Cir. 1991). Conners does not offer any evidence that Chief Rosa's conduct, however insensitive or obstinate, surpassed the pale of all bounds of human decency.  Therefore, the motion for summary judgment will be ALLOWED as to the claim of intentional infliction of emotional distress.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment will be ALLOWED in part and DENIED in part.  The motion is ALLOWED with regard to Conners' claims for retaliation, discrimination, hostile environment, and intentional infliction of emotional distress.  The motion is DENIED with respect to Conners' claims for entitlement to reimbursement of pay for his military leave taken on November 17, 2007.[17]  Trial will commence on February 15, 2010.[18]

SO ORDERED.

/s/ Richard G. Stearns

_____

---

[17]Defendants' motion to strike is DENIED.  The court has reviewed the purported inconsistencies between Conners' testimony at deposition and his affidavit attached to the opposition to the motion for summary judgment and finds the accused statements either not inconsistent or immaterial to this decision.

[18]Needless to say, it does not reflect well on plaintiff and defendants, all of whom are public servants, that they have spent tens of thousands of dollars, and now propose to spend tens of thousands more, to resolve a dispute that at most involves two or three hundred dollars.  Almost all of the costs, including those being allocated to the court and the prospective jurors, will be taxed to the public that the parties are sworn to serve and protect.

UNITED STATES DISTRICT JUDGE